DOROTHY EASLEY, Plaintiff-Appellee, v. APOLLO DETECTIVE AGENCY, INC. Defendant-Appellant.

First District (2nd Division)   No. 78-484

Opinion filed February 20, 1979.

Rothschild, Barry & Myers, of Chicago (John J. Coffey, III, of counsel), for appellant.

Philip A. Doran, Ltd., of Chicago (William J. Harte, Ltd., of counsel), for appellee.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Defendant, Apollo Detective Agency, Inc. (Apollo), appeals from a jury verdict in favor of plaintiff, Dorothy Easley, for damages suffered when an Apollo security guard, William Lee Brown, used a passkey to enter plaintiff's apartment and then assaulted her. The jury found Apollo guilty of wilful and wanton misconduct in hiring the guard and returned a verdict of $7,500 punitive damages on count I of the fifth amended complaint. Count II alleged that Apollo was responsible by statute for the conduct of its employee; the court directed a verdict against Apollo on the issue of liability, and the jury fixed compensatory damages at $20,000.[1]

Apollo appeals from the denial of its motion for a directed verdict on count I, from certain evidentiary rulings by the trial court, and from the amount of compensatory damages assessed by the jury on count II. No questions are raised on the pleadings or as to Apollo's liability under count II. The issues on appeal are: (1) whether the court erred in denying Apollo's motion for a directed verdict on the issue of wilful and wanton misconduct; (2) whether the court erred in admitting evidence of an ordinance of the City of Chicago pertaining to licensing of "special policemen," and evidence that Apollo's employee was not required to be so licensed; (3) whether the court erred in admitting evidence of the fact that Brown had twice been arrested prior to his employment by Apollo; (4) whether the court erred in admitting into evidence personnel files compiled by Brown's prior employers; (5) whether the court erred in admitting evidence of a threat made to plaintiff by Brown after a criminal court proceeding which arose out of Brown's assault on plaintiff; and (6) whether the award of compensatory damages is excessive.

The pertinent facts are as follows. On February 1, 1972, plaintiff moved into an apartment in the Chicago Beach Tower Apartments at 5050 South Lake Shore Drive, Chicago, Illinois. Plaintiff went to bed that evening at about 10 p.m., after locking the doors to her apartment. At about 4 a.m. the next morning, February 2, plaintiff was awakened by the sound of footsteps in the apartment. She rose, donned a robe, picked up a glass bottle, and left the bedroom to investigate. Plaintiff discovered Brown, the building security guard, standing in her kitchen with his .357 magnum handgun pointed at her head and wearing his Apollo security guard uniform.

---

[1] In an order otherwise denying Apollo's post-trial motion, the trial court ordered that the award for compensatory damages be reduced to $18,000 to account for plaintiff's receipt of $2000 from another original defendant pursuant to a covenant not to sue.

Upon discovering Brown, plaintiff threw the bottle into the air and began screaming and continued screaming as Brown brought the gun close to her head. Brown then grabbed her and shook her until she stopped screaming. He told her that he had used his passkey to enter her apartment and that he wanted to make love to her. Plaintiff broke away and tried to reach the kitchen door; Brown caught her, grabbed her again, pointed the gun at her head and said, "If you do that again, I will blow your head off." Brown then told her that he wanted to rape her, whereupon plaintiff threw up. Brown started pulling and shoving her, again threatened to kill her, and slammed the gun across her face, although on cross-examination plaintiff testified that Brown did not strike her with the gun.

Plaintiff tried to dissuade Brown while he held her for about 10 or 15 minutes. She then tried to break away but Brown caught her by the robe and threw her into the bedroom onto the bed. While holding his gun on her, Brown proceeded to run his other hand all over her body. He then started to undress and again threatened to kill her, while plaintiff continued trying to dissuade him. After about an hour, plaintiff was finally able to persuade Brown to leave, whereupon she became hysterical for a time. About a half-hour later, plaintiff used a phone in a neighbor's apartment to call the police, who brought Brown to plaintiff for an identification. Over objection, plaintiff testified that she next saw Brown two or three weeks later, after a proceeding in criminal court, at which time he was accompanied by Apollo's supervisor of guards, Captain Glenn. Brown walked up to her, pointed at her, and said, "I am going to get you."

Plaintiff testified that she was "a nervous wreck" as a result of her experience with Brown, that she would be awakened by the slightest sound and be unable to get back to sleep. She testified that it was two years before she could sleep through a complete night without waking up thinking that someone was breaking into her apartment, and if she heard a sound and did not see a person directly in front of her, she would start screaming, believing that she was going to be attacked.

At the time of the incident, plaintiff was a staff employee in a political primary campaign. She had been in sales before working in the primary campaign, and had always found meeting and talking to people easy. However, after her position in the campaign terminated, she took an office job where she would not have to meet strangers, because meeting people frightened her after the incident. It was approximately seven or eight months before she was able to resume her sales career. Plaintiff sought no medical attention and incurred no medical expenses. Her only direct out-of-pocket expenses from the incident resulted from her missing

seven or eight days of work at her political campaign job, at which she was paid $650 per month.

In her case-in-chief, plaintiff called several other witnesses. Frank Rogers, Apollo's office manager at the time Brown was hired, and president and part owner of Apollo at the time of trial, was called under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). Rogers was hired to act as personnel director and office manager for Apollo. Although he had prior experience in interviewing, he had no prior contact or experience with the security industry. It was Rogers' duty to check the background of each Apollo job applicant, as reflected in an employment application, with particular emphasis on prior work history. This background check was made primarily by telephoning prior employers. Apollo had no formal inquiry letters in 1970-71, nor did it have any forms to record information received over the phone. Rather, any verification was accomplished by simply marking "ok" or "not ok" on the application, along with any other comments.

Rogers testified concerning Brown's job application, which he took from Brown when he interviewed him. The application indicated that Brown had been referred to Apollo by Apollo's supervisor of guards. Two numbers appearing on the application were identified as Illinois and Chicago gun registration numbers. Brown's application listed a present address but not the number of years he had lived there. Rogers did not check the prior addresses; he said that he had probably instructed an office girl to do it, as the responsibility for checking the applications was diffused throughout the office. While Rogers testified that there should have been marks on the application indicating that Brown's prior Illinois addresses had been checked, there were no such marks, nor were there any letters in the file to indicate that Brown's prior out-of-State addresses had been checked. Neither were there any marks indicating that Brown's personal references had been checked, although it was the practice of Apollo to mark "ok" if someone had been contacted.

The application revealed that Brown had completed 2½ years of high school. He was not required to take any intelligence or psychological tests. Rogers stated that Brown showed him a security training program certificate and that this impressed him, but he did not retain a copy for the file. Brown stated on his application that he had never been arrested. Rogers testified that he was not aware of Brown's prior arrests until after Brown had assaulted plaintiff. He further testified that Apollo would not have hired Brown if Apollo knew that he had been arrested for something other than a minor traffic violation. The only way that Apollo would attempt to verify that an applicant had no such arrest record was by sending identifying information on the applicant to the State, which

would send back an identification card after checking the applicant. In this case the card was not received until February 5, 1973, and thus, while the State did not prohibit employment of the applicant pending completion of the investigation, Apollo did not have the benefit of the State's investigation of Brown when Apollo hired him. Rogers further testified that although the two partners in the business at the time, Reiter and Kirk, were both Chicago Police officers, neither attempted to check whether Brown had an arrest record with the Chicago Police Department, nor did Rogers ask Brown to authorize such a check. Rogers testified that information on arrest records was not available to Apollo.

During her examination of Rogers, plaintiff introduced into evidence and read from sections of the Illinois detectives and investigators act (Ill. Rev. Stat. 1975, ch. 38, pars. 201—1 *et seq.*) and an ordinance of the City of Chicago relating to licensing of "special policemen" (Chicago Municipal Code 1973, ch. 173). Rogers testified that it was his understanding that Apollo was only required to comply with the State statute and not the ordinance, and thus Apollo did not require Brown or any employee to be licensed as special policemen by the City of Chicago.

Brown's application listed two previous employers, Interstate Service and Task Power, both security guard firms. With regard to Brown's denial of previous arrests, Rogers testified that he relied on the fact that these firms had both hired Brown, as they had more experience than Apollo, although Rogers then admitted that he knew nothing about either firm. Brown's prior work experience was also reflected by the fact that he was given only four hours of on-the-job training, rather than 16, and was permitted to carry a gun from the outset of his employment, rather than waiting a month or two.[2] Rogers also testified to the fact that Apollo was under contract to provide security at Chicago Beach Towers at the time of the incident.

Rogers testified that the initials "ok, JR" appeared next to the names of Brown's prior employers, and that the final decision to hire Brown was made by Joe Reiter, one of the founding owners of Apollo. Rogers testified over objection that if he, Reiter, or anyone at Apollo had determined upon checking with Interstate that Brown had been fired for sleeping on duty, for "making eyes at a newly-hired female," and for trying to borrow money from the vice-president of the store to which he was assigned, Brown would not have been hired.

Joseph Reiter next testified for plaintiff under section 60. Reiter

---

[2] While we have in no way relied upon it, for purposes of information only we note that the legislature has since enacted P.A. 79-723, §1, eff. Oct. 1, 1975 (now Ill. Rev. Stat. 1977, ch. 111, par. 2622(11)), which provides that no one may be employed as an armed security guard until he has completed a course of study approved by and supervised by the Department of Registration and Education, consisting of not less than 30 hours of training in subjects including the theory of law enforcement, liability for acts, and the handling of weapons.

testified that as holder of the State license for Apollo, he had final responsibility for hiring decisions. Reiter stated that Apollo's inquiry into a job applicant's background was limited to the veracity of the applicant, which was checked primarily through prior employers. It was Apollo's policy to ask prior employers about the applicant's work history as listed on the job applications contained in their files; if any discrepancies between the two applications appeared, Apollo would contact any newly discovered employers. Apollo also regarded criminal activities as important matters to be checked out.

Reiter testified that he participated in the decision to hire Brown and that he personally called Interstate and Task Power, about which he testified that he knew nothing except that they were both security agencies. He said he spoke to "some woman" at Interstate and that he took notes of his conversation, but no notes appeared in Brown's file. Reiter stated that he learned that Brown had been licensed at Interstate, that he had been found asleep at his post once and had been late once or twice. Over objection he testified that he was not told that Interstate had fired Brown for sleeping on the job, that Interstate had found Brown to be unreliable and would not rehire him, that four days before he applied to Apollo, Brown had been put on probation for nonperformance of his duties, and that there had been a complaint against Brown for making eyes at a female employee and trying to borrow money from the vice-president of a store to which he was assigned. He testified that most of what he learned about Brown was positive and that the fact that Brown was already licensed was "half the battle." He then stated that he was told that Brown had left Interstate for "better employment."

Reiter testified that he also checked with Task Power and was told that Brown was also licensed when he was with Task Power, although Reiter never attempted to verify the licensing at either job. Reiter stated that he was told that Brown had been late a few times, but not that Brown had been fired for abandoning his watch post, or else he would never have been hired. He testified that he was told that Brown had left Task Power for better employment.

Reiter stated that when anyone from Apollo contacted references, it was required that notes be made and be inserted in the applicant's file, but no such notes appeared in Brown's file and Reiter had no personal knowledge whether Brown's references had been checked.

Reiter further testified that he did not attempt to check the records of the Chicago Police Department to determine if Brown had an arrest record because departmental regulations prohibited personal inquiries of that nature. He stated that he relied on the applicant's word and the fact that he had been licensed with two prior employers. Reiter also said that he never asked Brown to present a certificate of appointment as a special

policeman pursuant to the Chicago ordinance because he did not believe that it was required.

Willis Vreeman, the corporate director of guard service for Task Power Services, Inc., was called as a witness by plaintiff. Vreeman testified concerning the procedures by which Task Power made available information on its prior employees. He stated that the complete contents of an employee file could be examined and copied upon written request from a prospective employer. He also testified that information related to hiring and firing would be given over the phone to *bona fide* inquirers, whose name and number would be written down.

Vreeman appeared in response to a subpoena, directed to him as custodian of the employment records of guards as Task Power, to produce Task Power's file on Brown. Vreeman had no personal knowledge of Brown or of any phone calls from Apollo, and was on medical leave of absence at the time Brown applied to Apollo; however, Vreeman testified that all of the documents in the file were maintained in the ordinary course and conduct of business. Over Apollo's objection, Vreeman testified concerning the documents in the file, which was introduced into evidence. The file showed that Brown had resigned without notice by deserting his post; Vreeman testified that if Brown had not resigned, he would have been fired. Vreeman testified that this information would have been given to a caller interested in hiring Brown. He also identified one document in the file as a copy of an inquiry received from another prospective employer of Brown. There was nothing in the file to indicate that anyone from Apollo had ever contacted Task Power about Brown.

On cross-examination, Vreeman testified that Brown was hired and put to work by Task Power before he was cleared by the State. He further stated that there was nothing in the file to indicate that anyone at Task Power had checked with any of Brown's prior employers, or that he had been given any mental or psychological tests, or that he was given any training by Task Power, or that he had been required to be licensed as a special policeman. Vreeman said that it was the policy of Task Power to check with the Chicago Police Department to determine if an applicant had an arrest record, although there was nothing in Brown's file to indicate that such a check had been conducted.

Plaintiff also called James F. Schwab, the personnel manager for Interstate Services Corporation. Schwab testified concerning the procedures by which Interstate made available information on its prior employees. He stated that he was one of three people authorized to handle telephone inquiries about former employees. If he knew of the prospective employer, he would give information over the phone; if not,

he would require a written request. In either case, the Interstate employee file would reflect the name of the caller and the information disclosed.

Schwab also appeared pursuant to subpoena, bringing with him Interstate's file on Brown. He testified that the documents in the file were maintained in the ordinary course of business. Over objection, Schwab testified that the file contained no indication that anyone from Apollo had ever contacted Interstate regarding Brown, while the file did reflect an inquiry from another prospective employer, the City of Highland Park, though the file also indicated that the city had been told that Brown had left Interstate "for other employment." Records in the file, which was introduced into evidence, also indicated that Brown had been involved in the activities inquired about during plaintiff's examination of Rogers and Reiter, set out above.

The file also contained Brown's application for a position at Interstate, which revealed that Brown had been arrested once. Schwab testified that Brown had satisfactorily explained the arrest and thus was hired. Schwab also testified concerning Interstate's hiring procedures and the extent to which Interstate investigated prospective applicants.

A Chicago police officer appeared in response to subpoenas from both plaintiff and Apollo. Over Apollo's objection, he testified to the fact that Brown had been arrested twice before he was hired by Apollo, but he did not describe the nature and disposition of the charges, as the court had ruled that that information could not be inquired into. The officer also testified on behalf of Apollo regarding a Chicago Police Department special order then in effect, which prohibited the release of arrest information to police officers except in connection with official duties.

During its case-in-chief, Apollo recalled Frank Rogers of Apollo. He testified that at his initial interview, Brown had presented a letter of recommendation from a past employer as well as the training program certificate mentioned above. But although it was Apollo's policy to keep copies of such documents, there were no copies in Brown's file.

On cross-examination, Rogers reiterated Reiter's testimony to the effect that when someone from Apollo called a previous employer, it was Apollo's policy to compare the job history listed on the previous employer's application with the job history on the Apollo application, and to investigate any discrepancies. Over objection, Rogers was then questioned about the fact that on the Task Power application previously received into evidence, Brown had listed two additional prior employers, Burns Detective Agency and Lloyd's Detective Agency, neither of which was mentioned in the Apollo application or ever discovered by Apollo. Rogers also testified concerning the personal references listed on Brown's Apollo application, many of which had no telephone listing. Although it

was Apollo policy to send verification letters to people who could not be reached by telephone, and to keep copies of these letters in the file, there were no such copies in Brown's file.

Apollo also called a representative of the Illinois Department of Registration and Education, who testified regarding the information on job applicants that detective agencies must submit to the Department. He confirmed that applicants can be employed prior to their clearance by the Department, and he testified that Department approval issues if the record of the applicant is free from convictions of felonies and crimes involving moral turpitude.

The cause had come to trial on plaintiff's fourth amended complaint in three counts, alleging respectively negligent hiring, wilful and wanton misconduct in hiring, and statutory liability. At the close of the evidence, plaintiff submitted a fifth amended complaint in two counts. Count I charged Apollo with wilful and wanton misconduct in hiring Brown and sought punitive damages; count II alleged statutory liability and sought compensatory damages. The court denied Apollo's motions for directed verdict on both counts. The court granted plaintiff's motions for directed verdict on the issue of contributory wilful and wanton misconduct in count I and on the issue of statutory liability in count II. The remainder of the cause was submitted to the jury, which rendered the verdicts noted at the outset of this opinion.

The statute upon which count II is based is section 10b(10) of the detectives and investigators act (Ill. Rev. Stat. 1975, ch. 38, par. 201— 10b(10), now ch. 111, par. 2622(10)), which provides:

"The holder of a certificate of authority [to conduct a detective agency] who employs persons to assist him in the work of private detective and in the conduct of such business shall at all times during such employment be legally responsible for the good conduct in the business of each and every person so employed."

The section was enacted subsequent to, and apparently in response to, the decision in *Apex Smelting Co. v. Burns* (7th Cir. 1949), 175 F.2d 978, which upheld a directed verdict for defendant on facts somewhat similar to those here where there was no showing of negligent hiring and where *respondeat superior* was inapplicable because the employee's act fell beyond the scope of his employment.

Apollo does not contest on appeal the trial court's direction of a verdict against Apollo on the issue of liability under the statute. In the only reported case construing this section to date, the Federal court, sitting in diversity, held on similar fact that "the plain language of the statute makes defendant answerable for all acts of its employees in its business." (*Stewart Warner Corp. v. Burns International Security Services, Inc.* (N.D. Ill. 1973), 353 F. Supp. 1387, 1389.) While we need

not expressly consider the question here, it is difficult to imagine what situation the statute is designed to cover if not that in the case at bar.

Apollo also does not contest that, in a proper case, a count alleging wilful and wanton misconduct in hiring and seeking punitive damages may be pursued simultaneously with a count alleging statutory liability. We note that this is not a case in which punitive damages are being sought against a principal on the theory that the principal should be vicariously liable for the wilful and wanton misconduct of his agent (compare *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509), nor is this a case in which punitive damages are being sought in connection with a novel cause of action. (Compare *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) Rather, plaintiff has recovered compensatory damages on the somewhat novel statutory liability theory in count II and now seeks to preserve her recovery of punitive damages pursuant to count I, alleging wilful and wanton misconduct on the part of Apollo directly in hiring an unfit agent. While the cases are few, it is settled law in Illinois that there is such a cause of action against an employer for negligently hiring someone the employer knew, or should have known, was unfit for the position sought to be filled. (*Becken v. Manpower, Inc.* (7th Cir. 1976), 532 F.2d 56; *Tatham v. Wabash R.R. Co.* (1952), 412 Ill. 568, 107 N.E.2d 735; *Consolidated Coal Co. v. Seniger* (1899), 179 Ill. 370, 53 N.E. 733; *Western Stone Co. v. Whalen* (1894), 151 Ill. 472, 38 N.E. 241; see Restatement (Second) of Agency §213, comment *d* (1958).) It is also well settled that punitive damages are recoverable if the defendant's misconduct may be characterized as wiful and wanton (see generally Illinois Pattern Jury Instructions, Civil, No. 35.01 (2d ed. 1971); McKillip, *Punitive Damages in Illinois: Review and Reappraisal*, 27 DePaul L. Rev. 571 (1978)), and our supreme court has expressly approved, in dictum, the Restatement position that punitive damages are recoverable against a principal for the act of his agent if "the principal had been reckless in employing an unfit agent." *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 36, 330 N.E.2d 509, 512, quoting Restatement (Second) of Agency §217C (1958); see also *Rosenberg v. Packerland Packing Co.* (1977), 55 Ill. App. 3d 959, 964-65, 370 N.E.2d 1235, 1239-40 (claim of wilful and wanton entrustment held to state a cause of action).

We therefore move directly to Apollo's first contention on appeal, that the trial court erred in denying its motion for a directed verdict on the issue of wilful and wanton hiring. Apollo argues that the evidence only showed that Apollo was not as thorough in its investigating and record keeping procedures as it might have been, and that plaintiff failed to show that Apollo acted in reckless disregard of her safety in failing to determine that Brown was unfit. However, viewing all the evidence most favorably

to plaintiff, we cannot conclude that the evidence so overwhelmingly favored Apollo on the issue that no verdict for plaintiff could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) On the contrary, we believe that the jury could properly find that Brown was unfit, that a reasonably adequate investigation would have determined this fact, and that Apollo's virtually nonexistent investigation exhibited a reckless disregard for plaintiff's safety and constituted the proximate cause of plaintiff's injury.

Apollo nevertheless argues that, as a matter of law, its conduct did not rise to the level of wilful and wanton. However, as has been pointed out by our supreme court, the characterization of conduct as wilful and wanton is "a characterization that shades imperceptibly into simple negligence." (*Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 35, 330 N.E.2d 509, 511.) Moreover, it has been held that, in the selection of an agent, an employer will be held to the exercise of care reasonably commensurate with the perils and hazards likely to be encountered in the performance of the agent's duty; that is, such care as a reasonably prudent person would exercise in view of the consequences that might reasonably be expected to result if an incompetent, careless, or reckless agent was employed for the particular duty. (*Western Stone Co. v. Whalen* (1894), 151 Ill. 472, 38 N.E. 241; see also Comment, *Negligent Hiring and Negligent Entrustment: The Case Against Exclusion,* 52 Ore. L. Rev. 296, 299 (1973).) Keeping in mind that Apollo was hiring Brown to perform as an armed, uniformed security guard, in possession of a passkey to the apartments he was employed to protect, we cannot say that Apollo's conduct could not properly be characterized as reckless or wilful and wanton, and the trial court properly refused to direct a verdict in Apollo's behalf.

Apollo also argues that the fact that it followed the procedure mandated by the Department of Registration and Education, along with the fact that it investigated Brown about as thoroughly as the other security agencies, negate a finding of wilful and wanton misconduct. As to the practices of the other firms, suffice it to say that an entire industry could well be reckless. As to compliance with the State procedure, a similar claim was advanced in *Consolidated Coal Co. v. Seniger* (1899), 179 Ill. 370, 53 N.E. 733, where the defendant, charged with negligently hiring an incompetent mine hoist engineer, claimed that it could not have been negligent since the engineer was certified by the State. The court held that while such certification could be considered with other evidence on the question, it did not conclusively establish the employee's competence or the employer's freedom from negligence. Moreover, in the instant case the ultimate State approval was not issued until almost

one year and three months after Brown was hired; the jury could properly decide that something more in the way of investigation was required of Apollo in the interim.

Apollo also assigns error to certain evidentiary rulings by the trial court and asserts that it has been so prejudiced thereby as to be entitled to a new trial. Apollo first argues that the trial court erred in admitting evidence of a City of Chicago ordinance then in effect, pertaining to licensing of "special policemen," and evidence that Apollo's employee was not so licensed. The ordinance (Chicago Municipal Code 1973, ch. 173) pertinently provides that it is unlawful for anyone to engage in the business of a "special policeman" without first being licensed. The term "special policeman" is defined as "any person who, for hire or reward, shall guard or protect any building, structure, premises, person, or property within the city," other than regularly appointed city police officers and county sheriffs or deputy sheriffs.

Plaintiff had specifically alleged Apollo's failure to comply with the ordinance as one basis for her allegation of wilful and wanton misconduct. Apollo filed a motion in limine seeking generally to prevent introduction of the ordinance, on which motion the court initially reserved ruling. In a hearing on the motion, Apollo contended that the ordinance was invalid due to the legislature's passage of Public Act 78-1232, which became section 27 of the detectives and investigators act (current version at Ill. Rev. Stat. 1977, ch. 111, par. 2639), and which provides:

> "Pursuant to paragraph (h) of Section 6 of Article VII of the Constitution of 1970 the power to regulate the private Detective Business shall be exercised exclusively by the State and may not be exercised by any unit of local government, including home rule units."

The statute's validity was upheld in *United Private Detective & Security Association, Inc. v. City of Chicago* (1976), 62 Ill. 2d 506, 343 N.E.2d 453. However, the statute did not become effective until September 5, 1974, and therefore had not yet superseded the ordinance at the time Brown was hired. On that basis, the court ruled against Apollo and permitted the ordinance to be introduced into evidence. Later in the trial, however, Apollo drew the court's attention to an Opinion of the Corporation Counsel of the City of Chicago (25 Opin. of Corp. Counsel 316), which opined that a private detective employed to "guard or protect any building, structure, premises, persons, or property within the city" was not required to be licensed as a special policeman under the ordinance. It is unclear what relief Apollo was seeking at that stage, as it made no motion to strike the evidence of the ordinance; nevertheless, the court

refused to instruct the jury that failure to comply with the ordinance was a possible basis for a finding of wilful and wanton misconduct, and the court refused to permit plaintiff's counsel to so argue.

On appeal, Apollo argues that the ordinance was not applicable, citing the opinion of corporation counsel referred to above and *People v. Perry* (1975), 27 Ill. App. 3d 230, 327 N.E.2d 167. Apollo contends that admission of the ordinance, if inapplicable, was prejudicial and constitutes reversible error. (*Cf. Air Conditioning Training Co. v. Hildebrand* (1946), 330 Ill. App. 134, 69 N.E.2d 700 (abstract) (irrelevant FTC cease and desist order).) Plaintiff contends that Apollo has waived the point by initially objecting on the wrong ground and by later failing to move to strike the evidence of the ordinance from the record. (See *Balestri v. Highway & City Transportation, Inc.* (1978), 57 Ill. App. 3d 669, 373 N.E.2d 689.) However, even assuming that Apollo has not waived the point, we find that in the absence of controlling precedent, the court in its discretion could properly admit evidence of an ordinance which by its terms would seem to apply and to have some bearing on the issues of the case. (*Henricks v. Nyberg, Inc.* (1976), 41 Ill. App. 3d 25, 353 N.E.2d 273.) Apollo has cited no cases holding that the Opinions of the Corporation Counsel of the City of Chicago have any persuasive effect; in no case could such an opinion ever be considered controlling, and where, as here, an opinion's interpretation goes against the plain language of the ordinance it purports to interpret, is based on another opinion which is clearly distinguishable on its facts (*see* Opin. No. 11054), and is in conflict with another prior opinion (*see* Opin. No. 10646), we cannot hold that it is entitled to any weight. Moreover, Apollo's reliance on *People v. Perry* (1975), 27 Ill. App. 3d 230, 327 N.E.2d 167, is misplaced. In *Perry*, this court only held that security guards could not take refuge in the protections afforded special policemen under the ordinance, in the absence of any evidence that they were, in fact, special policemen. The question of whether the guards were required to be licensed as special policemen was neither raised nor considered. Thus, Apollo's contentions on this point are without merit.

Apollo next argues that the court erred in admitting evidence that Brown had been arrested twice prior to his employment by Apollo. Apollo concedes that one element of plaintiff's wilful and wanton theory was to prove that Brown was not fit to be employed as a security guard, and that Apollo should have determined this. (See, *e.g.,* Cleary, Handbook of Illinois Evidence §12.4 (2d ed. 1963); Comment, *Negligent Hiring and Negligent Entrustment: The Case Against Exclusion,* 52 Ore. L. Rev. 296, 298-99 (1973).) Apollo also concedes that unfitness may be shown by specific prior acts of misconduct. (*E.g.,* McCormick on Evidence §187 (2d ed. E. Cleary 1972).) Nevertheless, Apollo argues that

the fact of the arrests was improperly admitted, first, on the ground that "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct." (*Schware v. Board of Bar Examiners* (1957), 353 U.S. 232, 241, 1 L. Ed. 2d 796, 803, 77 S. Ct. 752.) Whatever the applicability of that statement in other contexts, we cannot hold that a person's prior arrests invariably have no relevance to whether he should be hired as a security guard; indeed, the fact that both Apollo representatives testified that they would not have hired Brown had they known of his prior arrests belies such a position. However, both the nature and ultimate disposition of the arrest charges would seem to have important bearing on the question of Brown's unfitness and on the extent of Apollo's misconduct, and from the record we cannot determine why only the fact of the arrests was permitted to be shown.

Apollo also asserts that the arrest record was erroneously admitted because there was no showing that Apollo could have discovered Brown's arrest record, due to the Chicago Police Department special order then in effect prohibiting release of such information to police officers for personal business. However, plaintiff also introduced evidence tending to show that Apollo could have determined that Brown had been arrested if Apollo had followed its practice of comparing entries on applications for jobs at Apollo with entries on applications contained in prior employers' files.

Apollo next argues that it could not, by law, have refused to hire Brown on the basis of his having been arrested; therefore, the fact that Apollo hired Brown despite the arrests cannot be a basis for a finding of wilful and wanton misconduct, and thus the arrests were erroneously admitted. For this proposition, Apollo first cites *Martin v. Conlisk* (N.D. Ill. 1972), 347 F. Supp. 262, in which the court held that an arrest without more was not sufficient cause to revoke a special policeman's license, and which is readily distinguished on the ground that an existing license constitutes a due process right on which a city may not impinge without notice and a hearing. Apollo next cites a line of cases including *City of Cairo v. Fair Employment Practices Com.* (1974), 21 Ill. App. 3d 358, 315 N.E.2d 344, which hold that various State or Federal employment discrimination laws are violated where persons with arrest records are automatically excluded from eligibility for jobs, because such blanket disqualifications have the impact of discriminating against blacks, who are arrested proportionately more often than whites. During oral argument, Apollo's counsel also referred to *Cook County Police & Corrections Merit Board v. Fair Employment Practices Com.* (1978), 59 Ill. App. 3d 305, 376 N.E.2d 11, which in addition held that under section 3(e) of the Illinois Fair Employment Practices Act (Ill. Rev. Stat. 1975, ch.

48, par. 853(e), added by P.A. 77-1552, eff. Sept. 17, 1971), it is an unfair employment practice for an employer to inquire on a written application whether a job applicant has ever been arrested. However, none of the cases cited by Apollo holds that arrests discoverable by other means do not remain a factor which may be considered; and we do not hold that Brown's arrests should have been wholly determinative, only that they should have been discovered and considered.

Finally, Apollo argues that, since under section 10b(1) of the detectives and investigators act (now Ill. Rev. Stat. 1977, ch. 111, par. 2622(1)), only conviction of a felony or crime of moral turpitude within the last 10 years automatically disqualifies one from being hired as a security guard, the fact that Brown had an arrest record was irrelevant since he satisfied the minimum legal requirements for the position of security guard. A similar contention was considered and rejected in *Consolidated Coal Co. v. Seniger* (1899), 179 Ill. 370, 53 N.E. 733, and our discussion of that case above is equally applicable here.

Apollo's next contention is that the court erred in admitting into evidence personnel files compiled by Brown's prior employers and in permitting testimony by representatives of the prior employers concerning their procedures regarding inquiries about former employees. At trial, Apollo objected to introduction of the contents of the file as hearsay; however, the testimony established them as business records within Supreme Court Rule 236(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 236(a)), and the court received them as such. Moreover, the material in the files was clearly relevant and probative on the issue of Brown's fitness. Nevertheless, Apollo argues that the files and testimony should not have been admitted because neither of the witnesses through whom the evidence was offered, though they were custodians of the records, could say that they had personal knowledge of the records or their creation, and one was not even with the company at the time the records were prepared. This contention is squarely rebutted by the language of the Supreme Court Rule itself, which provides that such considerations go only to weight, and by the case law under the rule. *E.g., Benford v. Chicago Transit Authority* (1973), 9 Ill. App. 3d 875, 293 N.E.2d 496.

Apollo also complains of the admission of the files for what they do not contain, that is, any notation that anyone from Apollo ever called the prior employers, along with testimony that such a notation would normally have been made. The files having once been admitted as business records, we believe that the absence of an entry therein could properly be admitted if accompanied by testimony that an entry would normally have been made. This is both the majority common law rule (McCormick on Evidence §307, at 722 (2d ed. Cleary 1972)) and the Federal rule (Fed. R. Evid. 803(7)), and the only Illinois case we have

found on the subject so holds. (*Lawrence v. Stiles* (1885), 16 Ill. App. 489.) We therefore hold that evidence of the absence of an entry in the records was properly admitted. While Apollo argues that there is evidence that one prior employer, Interstate, did not on one other occasion follow its procedure, this would go to weight, not admissibility.

Apollo also predicates error on the admission into evidence of a threat made to plaintiff by Brown after a criminal court proceeding which arose out of Brown's assault on plaintiff. Apollo had filed a motion in limine as to the criminal proceeding, on which the court initially reserved its ruling. Plaintiff's counsel mentioned the threat in his opening statement. During the direct examination of plaintiff, Apollo timely objected to testimony concerning events taking place after the day of Brown's assault on plaintiff as being irrelevant. The court stated, "I think it came out before, and they can show what he said to her afterwards. Nothing else." The court then overruled the objection and plaintiff testified to the threat. In closing argument, plaintiff's counsel referred to the threat as the "final straw."

Plaintiff contends that any error in admission of the evidence has not been preserved for review because Apollo failed to move to strike plaintiff's counsel's references to the threat in his opening statement and closing argument. However, Apollo objected and obtained a ruling at the time the evidence was offered, and we know of no authority requiring that an objection be made during opposing counsel's opening statement or be renewed during his closing argument after the court has already admitted the evidence over objection.

Plaintiff argues that the threat was properly admitted because plaintiff had the burden of showing that Brown was unfit and, as we have pointed out above, was permitted to introduce specific acts of misconduct to make that showing. However, Brown's character was logically in issue only insofar as Apollo knew, or should have known, of his character at the time Brown was hired and continuing up to the time he assaulted plaintiff. In short, specific acts of misconduct committed by Brown after the assault can have no relevance on the issue of whether Apollo recklessly put Brown in a position to make the assault. Plaintiff has cited no authority to the contrary, and the only explicit discussion of the point that we have found agrees that evidence of specific acts after the occurrence on which the claim is based is irrelevant. 2 Am. Jur. 2d Proof of Facts 624 (1974).

However, plaintiff advances another theory on which evidence of the threat might be deemed relevant; essentially this is that because Apollo is responsible for the hiring and the assault, Apollo is responsible for the threat. As to statutory liability, even assuming that Brown was still in the employ of Apollo at the time of the threat and granting that he was in the

company of an Apollo supervisor, the threat would still not appear to be "conduct in the business" for which Apollo would be statutorily liable. As to the allegation of wilful and wanton misconduct, plaintiff argues that because it was Apollo's misconduct that put Brown in the position where he had the original opportunity to assault plaintiff, Apollo was also the proximate cause of the threat made to plaintiff two weeks after the assault and growing out of the assault. Apollo argues that the threat is a superseding cause, breaking the causal connection between Apollo's original misconduct and the injury sustained by the threat.

While most intentional or criminal acts may be classed as those against which no reasonable standard of care would require a person to be on his guard (Prosser on Torts §44, at 282 (4th ed. 1971)), where such misconduct was to be anticipated and the risk of it was unreasonable, liability will be imposed even for intervening criminal acts. (Prosser, at 283.) While Apollo urges us to apply the test of the first Restatement of Torts, as applied in *Anderson v. Jones* (1966), 66 Ill. App. 2d 407, 213 N.E.2d 627, we think it more appropriate to use the more recently formulated test of section 442 of the Restatement (Second) of Torts (1965), which sets forth the following as considerations of importance in determining whether an intervening force is a superseding cause of harm to another:

"(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion."

Applying those considerations to the case at bar, we believe that this is one case in which an intervening intentional act, the threat, was the natural and foreseeable result of the actor's original misconduct and will not serve to sever the causal connection between the original act and the ultimate injury. The threat brought about the same kind of harm as resulted from Apollo's original recklessness, the terrorization of plaintiff.

The fact that one who would commit an assault would later threaten the one assailed when she pressed charges against him two weeks later appears normal and foreseeable rather than "extraordinary" as the Restatement uses that term; unhappily, it happens all too often. The threat was a dependent intervening force (see §441, comment *c*) operating because of, and not independently from, the situation created by the actor's original conduct. Finally, the threat, though a wrongful and possibly criminal act on the part of Brown, only came into operation because of Apollo's original act or failure to act, an act or omission capable of being found to be wilful and wanton. Thus, we find that this is one of those relatively rare cases in which an intervening intentional act does not operate to sever the causal connection between the original misconduct and the ultimate injury. Accordingly, evidence of the threat was not irrelevant and the trial court did not err in admitting evidence of the threat.

Finally, Apollo argues that the $20,000 award of compensatory damages is excessive. The amount of a verdict is largely within the discretion of the jury (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 452-53, 158 N.E.2d 63), and the jury's award will not be overturned unless it shows passion or prejudice (*Lau.*) In *Danile v. Oak Park Arms Hotel, Inc.* (1964), 55 Ill. App. 2d 2, 203 N.E.2d 706, the court upheld a verdict for $25,000 for a plaintiff against a hotel whose bellboy quickly raped her. The court stated that a party need not "offer exact proof of the monetary value of an emotional shock. The jury is capable of using its own knowledge to determine the strain and shock suffered by the appellee. In view of the attack made upon her, we cannot say that the amount of the verdict is excessive." (55 Ill. App. 2d 2, 9.) Those words are equally applicable here, and we also think it appropriate to take note of the fact that the value of the consumer's dollar has shrunk by more than half since the court in *Danile* made those remarks.[3] Moreover, the threat against plaintiff having been properly admitted, the aggravation of plaintiff's injuries attributable to the threat could also be considered by the jury. In view of the terror inflicted on the plaintiff in the instant case, causing a lasting emotional shock, we cannot say that the amount of the verdict is excessive.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING and HARTMAN, JJ., concur.

---

[3] Bureau of Labor Statistics, Department of Labor (1978).