TRANS WORLD AIRLINES, INC., Plaintiff-Appellant, *v.* STANDARD PAVING COMPANY, Defendant-Appellee.

First District (3rd Division)    No. 62367

Opinion filed December 30, 1976.—Rehearing denied February 2, 1977.

Kamin, Stanley & Balkin, of Chicago (Frank C. Stanley, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Perry L. Fuller, D. Kendall Griffith, and Joseph A. Camarra, of counsel), for appellee.

Mr. PRESIDING JUSTICE McNAMARA delivered the opinion:

The plaintiff, Trans World Airlines, Inc., brought this action seeking to recover $93,348.25 in damages sustained when one of its planes collided with a piece of machinery, a backhoe, owned and operated by the defendant, Standard Paving Company. TWA's claim is based upon a construction contract entered into with Standard. Both parties moved for summary judgment pursuant to section 57 of the Civil Practice Act. (Ill. Rev. Stat. 1973, ch. 110, par. 57.) The trial court granted Standard's motion for summary judgment and TWA appeals.

The circumstances surrounding the collision are not in substantial dispute. The following facts, either through pleadings, affidavits or oral depositions, were before the court.

In 1969, TWA contracted with Standard for the latter to install an asphalt apron on TWA property adjacent to a taxiway at Chicago-O'Hare

International Airport. Included in the contract was the following provision upon which TWA bases its claim:

> "Article 7. Contractor shall bear all risk of loss for and shall indemnify and save harmless Owner, its agents, servants and employees from and against any and all claims, loss, damage, costs and expenses, including without limitation reasonable attorneys' fees for any personal injury (including death) or any damage to or loss of property arising out of or in connection with the performance hereunder by Contractor, its subcontractors, or the agents or employees of Contractor or its subcontractors, whether or not attributable to any negligent act or omission of Owner, its agents, servants and employees but excluding any and all claims by reason of any negligent act or omission solely of Owner occurring during the term of this agreement and unrelated to Owner's performance of this agreement."

The taxiway adjoining the work area measured 150 feet in width and the adjacent asphalt apron on the TWA side of the taxiway was 20 feet wide. The airplane involved was a Boeing 707 and the highest part of its wing was 14 or 15 feet off the ground. The wing span of the 707 was 145 feet, 9 inches.

Vincent Minniti, operator of the backhoe for Standard, stated in his deposition that he watched the plane as it proceeded down the taxiway. The TWA plane was stopped for approximately 20 minutes while awaiting clearance. At that time the plane was 500 feet from where Minniti sat atop the backhoe three or four feet from the edge of the taxiway. The backhoe was used to load dirt onto trucks. At the time of the collision no trucks were present and the backhoe was not in use. Minniti next noticed the TWA plane when it was approximately 50 to 75 feet from the backhoe. The boom on the backhoe was about 15 or 16 feet in the air. As the plane continued down the taxiway, the wing extended over the backhoe. Minniti leaped from the backhoe when the wing was about 20 feet away. The wing extended over the apron area plus another four or five feet. Minniti estimated that the backhoe came into contact with the wing eight to 10 feet from the tip. All other witnesses agreed that the damage to the plane occurred from 10 to 12 feet from the wing tip.

According to Minniti, the plane collided with the backhoe about 15 to 20 seconds after it started down the taxiway. He never saw the pilot wave to him. His supervisor had told him in which area he was to operate the backhoe and he remained the same distance from the taxiway all morning. Minniti could not recall whether he had any warning flags atop the backhoe although there was a pole for the inserting of one. He did not remember if he sounded the horn. He did not attempt to move the backhoe as the plane approached since it would have taken him some 30

seconds to one minute to do so. The wing of the plane extended further over the area adjacent to the concrete than the other planes which had passed that way. Before the collision Minniti had never seen the wing of a TWA plane extended that far.

In his deposition, Joseph Schiavo, pilot of the TWA plane, stated that the taxiway was covered with patches of snow and wet spots. After he left the cargo ramp, Schiavo approached the taxiway where he was unable to make a sharp turn to the right. The weather conditions caused him to make a wider than ordinary turn onto the taxiway. Schiavo proceeded down the taxiway, the nose of the plane approximately eight to 10 feet to the left of the guiding center line. A plane ahead forced Schiavo to stop and await clearance. As he waited, Schiavo noticed defendant's backhoe off the edge of the taxiway. The backhoe was behind the cockpit, but ahead of the wing on the left side of the plane where Schiavo was sitting. Schiavo waved at the operator of the backhoe. The operator saw Schiavo, but remained motionless. Schiavo did not see any flags atop the backhoe.

When cleared to move ahead, Schiavo believed that he had sufficient clearance for the tip of the wing on his side to pass the backhoe. He angled the plane slightly to the right. He could not steer the plane too far to the right since some baggage carts approximately eight feet high were on that side of the plane. The copilot had remarked to Schiavo that the baggage carts were close to the plane. When the taxiway was clear, Schiavo moved the plane forward. After it proceeded 15 to 20 feet, Schiavo felt a lurch. The plane had proceeded for five to 10 seconds at a speed of three to four miles per hour. The plane was not equipped with mirrors of any kind to aid his rear vision. A TWA mechanic drove up and informed Schiavo that the left wing had struck the backhoe and the plane was leaking fuel.

In his deposition, Wayne Cochran, the copilot, stated that only Schiavo was able to view the left wing as they proceeded down the taxiway. Cochran had remarked to Schiavo about the four large baggage carts to the right of the plane, and had told him the clearance to the right was adequate. Cochran then felt the bump.

According to Cochran, it is desirable to strive for the maximum wing clearance possible, although no specific clearance is set out in the rules. It is necessary to judge whether the room is adequate before bringing the wing tip near a potential obstruction. Cochran did not observe any warning flags in the construction area off the taxiway.

Jack Robertson, a supervisory pilot for TWA, inspected the site of the occurrence approximately one hour after the collision. The backhoe was parked adjacent to the taxiway and he saw no flags atop it. Schiavo told him that he believed there was sufficient wing tip clearance since the operator of the backhoe had not signaled him otherwise. Robertson stated

that because it is difficult for a pilot to determine if the wing will clear an object he often relies upon others to ensure that the area is free of obstructions.

Donald Samford, an aircraft mechanic, saw the collision. After the occurrence the backhoe was very close to the taxiway and could have been touching it. John Dusak, aircraft maintenance foreman, also visited the scene after the collision. He estimated that the backhoe was three to four feet from the edge of the taxiway.

Hillary McClimans, manager of pilots, conducted a hearing subsequent to the collision. He concluded that Schiavo should have kept his eye on the wing until it had cleared the backhoe. If it is questionable whether there is adequate clearance, the pilot should stop the plane and send a wing man out to check. While the backhoe did not have any flags, Schiavo saw the machinery when he came to the area and saw it again when he taxied out prior to the collision. McClimans removed Schiavo from the schedule for three days and issued a letter of reprimand stating that Schiavo was derelict in not following flight operations procedure and federal air regulation procedures.

In granting Standard's motion for summary judgment, the trial court found that the pilot of the plane was guilty of negligence as a matter of law; that the contract between the parties was one of indemnity and not insurance; and that the contract did not give TWA the right to recover for damages resulting from its own negligence.

On appeal, TWA contends that the language of Article 7 of its contract expressly allows recovery regardless of whether it was negligent in causing such damages. Standard counters by claiming that TWA has no right to indemnity since it incurred no loss to a third party; that Article 7 contains no promise to pay TWA for damage to its own property; and that the exclusionary language of Article 7 applies in that the damage to the plane occurred solely by reason of TWA's negligence arising out of an activity unrelated to TWA's performance of the contract.

We deem it necessary to consider only whether the exclusionary language of Article 7 precludes TWA's right of recovery based upon that provision of the contract.

TWA relies primarily upon the case of *Westinghouse Electric Elevator Co. v. LaSalle Monroe Building Corp.* (1946), 395 Ill. 429, 70 N.E.2d 604, and its progeny to support its claim for indemnification. *Westinghouse* holds that one may contract to be indemnified against losses arising from one's own negligence; it also holds that such a provision must be expressed in clear and unequivocal terms. Each contractual provision must stand on its own language and the agreement must be given a fair and reasonable interpretation based upon consideration of all its language

and provisions. *Tatar v. Maxon Construction Co.* (1973), 54 Ill. 2d 64, 294 N.E.2d 272.

■■ The contract between TWA and Standard does provide that TWA may be indemnified for losses resulting from negligent acts or omissions on the part of TWA. However, that provision also contains the following language which limits recovery on the part of TWA as follows:

> "* * * but excluding any and all claims by reason of any negligent act or omission solely of Owner occurring during the term of this agreement and unrelated to Owner's performance of this agreement."

In our view, the exclusionary language in Article 7 precluded TWA from recovery under that article. The undisputed facts reveal that the negligence of the pilot, Schiavo, was the sole cause of the collision between the aircraft and the backhoe. The pilot admitted that his turn onto the taxiway had been wider than usual. As he proceeded down the taxiway the nose of the plane remained eight to 10 feet to the left of the guiding center line. He then permitted the plane to strike a stationary piece of machinery which had been plainly visible to him. It also had been established by Captain McClimans that it was incumbent upon the pilot to ascertain whether the wing had sufficient clearance before proceeding.

■■ TWA concedes that its pilot was negligent. It states, however, that such negligence was not the sole cause of the collision, but that Standard "set the stage" for the collision by positioning the backhoe in close proximity to the taxiway. In so arguing, TWA relies upon the recent holding in *Nogacz v. Procter & Gamble Manufacturing Co.* (1975), 37 Ill. App. 3d 636, 347 N.E.2d 112, where this court held inapplicable a provision in an indemnity contract which did not cover claims based solely on the negligence of Procter. *Nogacz* is distinguishable from the present case since there plaintiff brought suit against the designer of the building as well as the owner, Procter, alleging that each was responsible for the defective scaffolding from which he had fallen. The court reasoned, therefore, that Procter was not the sole cause of the plaintiff's injuries and that the exclusionary language in the indemnity contract was inapplicable. Here, the pilot's conduct was the sole cause of the collision. The mere physical presence of the backhoe in close proximity to the taxiway is insufficient to relieve TWA of sole responsibility for an occurrence unrelated to its performance of the contract. (See *Smart v. International Harvester Co.* (1975), 33 Ill. App. 3d 241, 337 N.E.2d 68.) TWA has pointed out that the backhoe had no warning flags on it. However, in view of the pilot's statement that he had seen the backhoe's exact position throughout the entire period, this fact has no significance. It

should also be noted that the impact did not occur at the wing tip, but rather eight to 12 feet inward. The trial court correctly granted Standard's motion for summary judgment.

Since we have determined that, in light of the undisputed circumstances of this case, the exclusionary language of Article 7 precludes recovery by TWA, it is unnecessary to consider the other factors determined by the trial judge in granting summary judgment.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGLOON and MEJDA, JJ., concur.