Vivian DeMYRICK, etc., Plaintiff,

v.

GUEST QUARTERS SUITE HOTELS, et al., Defendants.

No. 93 C 1520.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 5, 1996.

Phillip Harnett Corboy, Jr., Corboy and Demetrio, Chicago, IL, for plaintiff.

Kathleen McCabe, Cassiday, Schade & Gloor, Chicago, IL, for defendant Guest Quarters Suite Hotels.

Charles William Cross, Aronson, Smith and Cross, Chicago, IL, for defendant Standard Parking Corporation.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This wrongful death and survival action stems from the fatal shooting of Rhoderick Rountree ("Rountree") on May 25, 1992. Vivian DeMyrick ("DeMyrick"), Rountree's mother and the personal representative of his estate, initially sued Guest Quarters Suite Hotels ("Guest Quarters") in the Circuit Court of Cook County, from which the case was properly removed to this District Court under diversity-of-citizenship jurisdiction. Guest Quarters then filed a third party complaint against Standard Parking Corporation ("Standard"), which was later added as a direct defendant by DeMyrick's Amended Complaint.

Each of Guest Quarters and Standard has now moved for summary judgment against DeMyrick under Fed.R.Civ.P. ("Rule") 56, and both motions have been fully briefed. For the reasons stated in this memorandum opinion and order, Guest Quarters' motion is denied and Standard's motion is granted.

### Summary Judgment Standards

Under familiar Rule 56 principles, a party seeking summary judgment bears the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). This Court is called upon to draw inferences in the light most favorable to the non-moving party, but it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991)).

To assist in resolving Rule 56 motions, this District Court's General Rule ("GR") 12(M) and 12(N) respectively require the submission of factual statements in support of and in opposition to such motions. Each party has complied with those requirements,[1] facilitating this opinion's ability to credit the facts asserted and adequately supported by each movant unless controverted by DeMyrick (*Stewart v. McGinnis*, 5 F.3d 1031, 1034–35 (7th Cir.1993)).

### Facts

On Sunday May 24, 1992 three youths spent the evening driving around Chicago looking for women and a place to party (G.Q. 12(M) ¶ 9). All three were in their early twenties and were friends from high school (S. 12(M) ¶ 13; Foley Dep. 5; Copeland Dep. 7). Two of the three, Christopher Babbington ("Babbington") and Christopher Foley ("Foley"), worked as car hikers for the same employer, Standard—Babbington at its Guest Quarters location and Foley (a recent

---

**1.** Statements by Standard and Guest Quarters are cited as "S. 12(M)" and "G.Q. 12(M)" respectively. Those statements have been referred to where DeMyrick's response either explicitly or implicitly admits an assertion in the corresponding GR 12(M) statement.

hire) at another garage (S. 12(M) ¶¶ 4, 7). Neither, however, was on duty that night (*id.* ¶¶ 5, 8). Kenneth Copeland ("Copeland"), the third of the trio, had no connection to Standard (*id.* ¶ 11). When Copeland left his home that evening he armed himself with a gun that he had recently obtained from the street (Copeland Dep. 22–24).

Sometime well after midnight, en route from a nightclub called The Click to the Rainbow Skating Rink, Babbington suggested that they stop by Guest Quarters (G.Q. 12(M) ¶ 9). Ostensibly Babbington wanted to check his work schedule for the following day (Foley Dep. 16, 18), but testimony (which must be credited on the current motions) indicates that the young men may have known that the music stars Hammer and Boyz II Men were staying in the hotel and were hoping to find ongoing parties connected to the groups' presence (Copeland Dep. 41).

Upon their arrival at Guest Quarters, Babbington went to the parking garage booth near the hotel entrance to speak with the sole Standard employee on duty, Lesly Beauzile ("Beauzile") (G.Q. 12(M) ¶ 10). About the same time Copeland and Foley went into the hotel lobby, stating their intention either to locate a restroom or to "find out where the party is" or both (*id.;* Beauzile Dep. 35). Babbington then also entered the hotel, where he apparently encountered one or more women who were hotel guests (Foley Dep. 19, 80; Copeland Dep. 39). Either at the invitation of the women or upon their own initiative, the three friends took the elevator to the guest floors (Foley Dep. 22–23).

After a brief detour to another floor, the three went to the 27th floor where they began knocking on doors, looking for the women that they had seen (Foley Dep. 42; Copeland Dep. 23–24). Their knocking first roused Hammer's manager Craig Brooks ("Brooks"), who came to the door and spoke with the young men (G.Q. 12(M) ¶ 11). Brooks estimated the time to have been either 3 a.m. or 5 a.m. (Brooks Dep. 41, 87) and said that the three "definitely had been drinking" (*id.* 87). Brooks says that he was not concerned because they "looked like little kids," except for Copeland who seemed "suspicious" because he was leaning against the wall with his hands hidden (*id.* 46). Brooks told them that there were no more parties that night and shook Foley's hand before he closed the door (G.Q. 12(M) ¶ 11).

Despite the discouragement from Brooks, the three did not leave the hotel and eventually awoke Rountree by loud talking and laughing outside his door on the 27th floor (G.Q. 12(M) ¶¶ 13–14). Rountree came to the door wearing only a pair of shorts (Foley Dep. 28). Described by one of Hammer's group as having a "sumo wrestler" build (Norfleet Dep. 72), Rountree was approximately 6 feet 3 inches tall, weighed over 300 pounds (Jones Dep. 32) and was employed as Boyz II Men's road manager, a position that entailed overseeing the group's security (G.Q. 12(M) ¶ 8). Rountree asked Babbington to show identification to prove that he worked for the hotel (Copeland Dep. 50–53), and Rountree then told the three to wait outside the door while he got something from his room (G.Q. 12(M) ¶ 15).

As Babbington, Foley and Copeland instead walked to the elevator, Rountree followed and caught up with them just as the elevator doors were closing (*id.* ¶ 16). It is disputed whether Rountree then had an automatic gun drawn (Foley Dep. 30, 95; El–Amin Dep. 135; Norfleet Dep. 43). On the way to the elevator Copeland handed the gun that he had been carrying to Babbington (S. 12(M) ¶ 12), something that Copeland thought might avoid trouble if they encountered security because Babbington knew the security employees and "they probably won't mess with him" (Copeland Dep. 54). Both Copeland and Foley say that immediately upon entering the elevator Rountree hit all three boys with both his gun and fists as they rode to the 26th floor (Foley Dep. 31, Copeland Dep. 58).

Once they arrived at the 26th floor, Rountree shouted for his assistant, Quadree El–Amin ("El–Amin"), whose room was on that floor (G.Q. 12(M) ¶ 17). El–Amin told the woman staying in his room to call security and joined the four men in the elevator (*id.* ¶ 18). According to El–Amin, Rountree told him that the three young men had tried to

break into his room, and El–Amin responded that they should escort the boys to hotel security (El–Amin Dep. 127–28, 131). El–Amin also says that he did not notice a weapon in Rountree's hand and that one of the men was kneeling, although none appeared to be bleeding or hurt (*id.* 131, 135). Copeland and Foley tell a different version, in which Rountree attempted to drag the three boys to the stairwell on the twenty-sixth floor while El–Amin joined in the assault (Foley Dep. 33–40; Copeland Dep. 60–65).

What is undisputed is that at some point all five men entered the elevator, where a struggle ensued and Babbington shot and killed Rountree (G.Q. 12(M) ¶ 19; S. 12(M) ¶ 2). Panic-stricken, the three young men raced down 26 flights of stairs and fled the premises in their car (Foley Dep. 41–44; Copeland Dep. 68–69).

### Guest Quarters' Motion

■ Under Illinois law [2] a plaintiff in tort must establish defendants' duty of care owed to plaintiff, a breach of that duty and an injury proximately caused by that breach (*Wojdyla v. City of Park Ridge*, 148 Ill.2d 417, 421, 170 Ill.Dec. 418, 420, 592 N.E.2d 1098, 1100 (1992)). Here, however, Guest Quarters limits its discussion to the issue of proximate cause and to a claim of Rountree's contributory negligence, denying only cursorily that it breached any duty owed to Rountree (G.Q.Mem. 8 and R.Mem. 7). That could well entitle this Court to treat the issues of duty and breach as effectively waived for purposes of this motion.

For analytical purposes, though, Guest Quarters gets better than it deserves, for in the course of resolving the proximate cause issue this Court must perforce examine just what action or inaction by Guest Quarters

may be labeled as "negligent"—that is, as something from which the proximate cause chain could properly extend. Accordingly, this opinion briefly discusses a hotel's duty to its guests under Illinois law in light of the facts of this case, before it turns to the issues of proximate cause and contributory negligence.

### Duty and Breach

■ In terms of the hotel-guest relationship in Illinois, "[w]hether or not defendants have a duty to protect plaintiff from independent, intervening criminal acts of third persons depends upon whether such acts are foreseeable" (*Mrzlak v. Ettinger*, 25 Ill. App.3d 706, 709, 323 N.E.2d 796, 798 (1st Dist.1975)). More specifically, "where an assault upon a guest by a third party is involved ... the hotel is held to a high degree of care" (*id.* at 712, 323 N.E.2d at 800). Guest Quarters clearly owed Rountree a duty to protect him from foreseeable criminal attack.

Guest Quarters assumes arguendo that it breached its duty. To flesh out that assumption, this opinion looks to the security measures described in the record, viewed in the light most favorable to DeMyrick as Rule 56 requires. Despite Guest Quarters' knowledge that two famous groups were staying in the hotel (Nichols Dep. 16–17) and that its own employees had requested additional security due to problems the night before (Winn Dep. 17–19), Guest Quarters had only one security employee on duty that night (*id.* at 16). Indeed, even that employee had no prior experience in security (DeBerry Dep. 14) and had previously requested another employee's company to walk the halls, taking him away from his post (Winn Dep. 28–29). Entrances to the hotel were not continuously monitored either via the surveillance cameras (Benolken Dep. 70–71) or by ensuring that someone was always stationed at the front

2. In diversity actions this Court looks to Illinois for its choice of law rules (*Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Illinois follows the Restatement (Second) "most significant contacts" approach for tort actions (*Ingersoll v. Klein*, 46 Ill.2d 42, 48, 262 N.E.2d 593, 596 (1970)). Here three of the four factors requiring consideration under *Ingersoll* point to Illinois: (1) the place where the injury occurred, (2) the place where

the conduct occurred and (3) the place where the relationship of the parties is centered. Those elements, in addition to Standard's dual Illinois citizenship under 28 U.S.C. § 1332(c)(1), heavily outweigh the only non-Illinois elements: Rountree's California domicile (also ascribable to De-Myrick under 28 U.S.C. § 1332(c)(2)) and Guest Quarters' dual Delaware and Connecticut citizenship. Illinois substantive law plainly applies.

desk with a view of the lobby (Winn Dep. 46–47). Finally, key checks were not performed to restrict access to guest rooms to persons staying in the hotel (*id.* 33–35; Brooks Dep. 72).

For present purposes, then, Guest Quarters' breach of duty may be framed this way: Its inadequate security measures failed to prevent Foley, Babbington and Copeland from gaining access to the upper (guest) floors and further failed to provide intervention when the three of them bothered sleeping guests in their search for a party. It is in those terms that the proximate cause question must be scrutinized.

*Proximate Cause*

Guest Quarters argues that its conduct merely created a condition that made Rountree's death possible and that an intervening force—Rountree's alleged negligence in opening his door and confronting the three young men—broke the proximate cause chain (G.Q.Mem. 8–14). As an initial matter, there is a genuine dispute of fact about whether Rountree contributed to the escalation of violence or had his gun drawn at any point in the confrontation (Norfleet Dep. 30–33, 43; Zaragoza Dep. 7)—a dispute that under Rule 56 principles must be resolved against either of those possibilities. Hence only Rountree's opening the door, speaking to the boys and peacefully escorting them downstairs will be considered for purposes of this Rule 56 motion.

■ Proximate cause comprises two elements: cause in fact and legal cause. Cause in fact exists where the defendant's conduct "was a material element and a substantial factor in bringing about the injury," and legal cause exists when "the injury is of a type which a reasonable man would see as a likely result of his conduct" (*Lee v. CTA*, 152 Ill.2d 432, 455, 178 Ill.Dec. 699, 708–09, 605 N.E.2d 493, 502–03 (1992)). Under Illinois law, both facets of the determination of proximate cause in those terms are usually (though not always) matters to be left to a jury (*Suzik v.*

*Sea–Land Corp.*, 89 F.3d 345, 349–50 (7th Cir.1996)):

> Illinois courts are reluctant to decide proximate cause as a matter of law; and ... this reluctance is heightened when the issue of proximate cause turns on whether the plaintiff's conduct was a foreseeable result of a dangerous condition created by the defendant.
>
> \* \* \* \* \* \*
>
> Nevertheless, Illinois courts have held that defendants are not required to foresee every injury-causing accident that can possibly arise from the dangers they have created. The law provides that it is reasonable for defendants to foresee some, but not all, accidents arising from their conduct. If the accident that injures the plaintiff is not of the kind that the defendant could have foreseen, a court may decide proximate cause as a matter of law.[3]

Applying that test and distinguishing the situation in *Lee* (where the Illinois Supreme Court had found the nature of the accident foreseeable by defendant), *Suzik, id.* at 350 took the issue away from the jury.

■ In this instance a reasonable jury could find both elements of proximate cause present. Guest Quarters' inadequate security was responsible for the three boys' presence on the guest floors, and by definition a jury could reasonably conclude that such presence played a substantial factor in Rountree's shooting—thus plainly meeting the cause in fact requirement. As for the second element, it would just as clearly be reasonable for a jury to find that a violent altercation was the foreseeable result of the hotel's lack of security. Violence is more than a slight possibility when fans looking for action tangle with the protective entourage of a hugely popular entertainer in the middle of the night—and given the prevalence of gun toters in our citizenry, the prospect that such

---

**3.** [Footnote by this Court] Although *Suzik* addresses the Illinois standard for a directed verdict, the federal standard for judgment as a matter of law under Rule 50(a) (what used to be called a "directed verdict") is no different. And that in turn equates to the summary judgment standard under *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

violence may involve the use of a weapon is similarly unsurprising.

Guest Quarters seeks to invoke *Suzik* by claiming that Rountree's failure to follow instructions on the back of his door similarly constituted an intervening force. But such a determination cannot be made as a matter of law. Guest Quarters conveyed those "instructions" via a sign that Rountree may or may not have seen—a sign that only warned against opening the door without looking out of the peephole but did not offer any alternative course of action, such as calling security (Benolken Aff. Ex. 2). As *Lee* illustrates, under Illinois law it is considered foreseeable that a plaintiff will ignore an inadequate warning (*Lee*, 152 Ill.2d at 454, 456, 178 Ill.Dec. at 708–09, 605 N.E.2d at 502–03). Further, unlike the *Suzik* plaintiff who had a known back injury when he violated his employer's rule and lifted the tank, Rountree was not physically vulnerable but in fact was a man of imposing size (Jones Dep. 32) who had experience dealing with unruly fans (El–Amin Dep. 210–212; Bivens Dep. 32–34)—both factors that operate to negate Guest Quarters' implication that his behavior was completely irrational.

In sum, under Illinois law[4] a reasonable jury could find that Guest Quarters' conduct was a proximate cause of Rountree's death.[5] And because there may be more than one such proximate cause (see n. 5), this opinion turns next to the issue of contributory negligence.

*Contributory Negligence*

■ In tort actions in Illinois, "the plaintiff shall be barred from recovering damages if the trier of fact finds that the contributory fault on the part of the plaintiff is more than 50% of the proximate cause of the injury" (735 ILCS 5/2–1116(c)). As with the inquiry into whether a defendant's conduct meets the proximate cause test, the determination of a plaintiff's contributory negligence is usually left to the jury. It becomes a question of law appropriate for summary judgment only when "all reasonable minds would agree that the evidence and reasonable inferences therefrom, viewed in a light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand" (*West v. Kirkham*, 207 Ill.App.3d 954, 958, 152 Ill.Dec. 836, 838, 566 N.E.2d 523, 525 (4th Dist.1991)).

■ Guest Quarters relies almost exclusively on *Wassell v. Adams*, 865 F.2d 849 (7th Cir.1989) to support its claim that Rountree's actions were sufficiently negligent to warrant removing the question of proximate cause from the jury. But the totally different procedural posture in *Wassell* vitiates any such reliance. There a woman staying alone in an inexpensive motel opened her door to a stranger and allowed him to enter the room, whereupon he raped her. In the tort suit that followed, a jury found the woman to be 97% negligent and the motel to be 3% negligent, and the question on appeal was whether the trial court abused its discretion in finding that a jury verdict was not against the clear weight of the evidence (*id.* at 854). Far from finding that the verdict was the *only* one required by law, the Court of Appeals actually stated (*id.* at 856) that the verdict "probably seems wrong to us, but we have suggested an interpretation of the evidence under which the verdict was consistent with the evidence and the law. And that is enough to require us to uphold the district judge's refusal to set aside the verdict."

---

4. Guest Quarters also cites to two recent New York cases where opening an apartment door was found to be an intervening force: *Elie v. Kraus*, 218 A.D.2d 629, 631 N.Y.S.2d 16 (1995) and *Benitez v. Paxton Realty Corp.*, —— A.D.2d ——, 637 N.Y.S.2d 11 (1996). Apart from the fact that such New York law precedents are not directly applicable to this case, there are some obvious differences between buzzing a stranger into one's own apartment and walking into a hotel hallway to quiet noisy youths.

5. This is of course deliberately framed in terms of "a" rather than "the" probable cause. As IPI 15.01 calls for instructing Illinois juries in that respect:

When I use the expression "proximate cause," I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it causes the injury.

Under the very different Rule 56 standard, a reasonable jury could certainly find that Rountree's walking into the hallway and escorting Foley, Babbington and Copeland down in the elevator was not contributorily negligent—or at least was not over 50% responsible for his injury. As already said, Rountree was a very large man experienced in dealing with restraining unruly fans (Jones Dep. 32; El-Amin Dep. 210–212; Bivens Dep. 32–34), and his stepping into a hallway in a full-service hotel to speak with three noisy fans might well be found to have been the actions of a reasonable man.

*Conclusion*

DeMyrick has survived on the first proximate cause issue and has dodged Guest Quarters' bullet on the second. Accordingly summary judgment is denied to Guest Quarters.

*Standard's Motion*

*Negligent Hiring Claim*

DeMyrick charges that Standard failed to screen Babbington and Foley properly for whether they had criminal records before hiring them and that such claimed delinquency proximately caused Rountree's death. In that respect, when he was hired in 1992 Babbington had been arrested on several occasions but had never been convicted (S. 12(M) ¶ 6), while Foley had been arrested a similar number of times and had once been convicted of violating 720 ILCS 5/24–1(a)(10) (captioned "Unlawful Use of Weapons"), for which he received a sentence of one year's court supervision (a term that, having been completed without further incident, resulted in the discharge of the term of supervision) (S. 12(M) ¶ 9; S. Ex. G).

*1. Arrest Records*

Under one provision of the Illinois Human Rights Act ("Act"[6]), as it existed in 1992 when Foley and Babbington were hired by Standard (Act § 2–103):

Unless otherwise authorized by law, it is a civil rights violation for any employer, employment agency or labor organization to inquire on a written application whether a job applicant has ever been arrested or to use arrest information or criminal history record information ordered expunged, sealed or impounded under Section 5 of the Criminal Identification Act as a basis for denying employment or promotion.

DeMyrick seeks to escape that provision by pointing to a statutory exception (Act § 2–104(A)(1)):

Nothing contained in the Act shall prohibit an employer, employment agency or labor organization from:

(1) Bona Fide Qualification. Hiring or selecting between persons for bona fide occupational qualifications or any reason except those civil-rights violations specifically identified in this Article.

■ DeMyrick's contention that arrest records are a bona fide occupational qualification ("BFOQ") for a hiker who parks cars for hotel guests is unsupported by Illinois law. One of the few cases that accept arrest information as relevant to a hiring decision is *Easley v. Apollo Detective Agency, Inc.*, 69 Ill.App.3d 920, 26 Ill.Dec. 313, 387 N.E.2d 1241 (1st Dist.1979). But that decision relied on the Fair Employment Practices Act (Ill. Rev.Stat. ch. 48, ¶ 853), which barred employers only from *asking* about arrest records on their applications but did not bar their use of such information obtained in other ways. In *Easley* the employer could have discovered the information about the employee through that employee's applications for employment at previous positions (*id.* at 935, 26 Ill.Dec. at 323, 387 N.E.2d at 1251). Such an approach in Standard's case would have violated Act § 2–103, which prohibited either (1) inquiring about arrest information *or* (2) discriminating on the basis of such information.

More to the point, *Cook County Police and Corrections Merit Board v. Illinois FEPC*, 59 Ill.App.3d 305, 305, 17 Ill.Dec. 118, 121, 376 N.E.2d 11, 14 (1st Dist.1978) found that the absence of an arrest record was not a

**6.** Citations to the Act, 775 ILCS 5/1–101 to 5/10–103, will take the form "Act § —," omitting the "775 ILCS 5/" common to all of its provisions.

BFOQ for either a corrections officer or patrolman, stating:

> There is an important distinction between an arrest and a conviction. An arrest record alone does not indicate guilt or disrespect for the law.

For that reason the court declined to authorize employers' inquiry beyond an applicant's conviction record.

To the same effect, *Ernst v. Parkshore Club Apartments Ltd. Partnership*, 863 F.Supp. 651, 656 (N.D.Ill.1994) more recently held under Illinois law that the absence of an arrest record was not a BFOQ for a maintenance position that included the issuance of a passkey to residential apartments.[7] Noting that the BFOQ exception "must be construed very narrowly" under *Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977), *Ernst*, 863 F.Supp. at 656 found that the employee's arrest record "would tell an employer nothing regarding his ability to perform maintenance work" and would operate against the policy of rehabilitating criminal offenders.

Under Illinois law, then, the nonexistence of an arrest record is not a BFOQ for a parking attendant. Because Standard could not have considered Babbington's and Foley's arrest records when hiring them without violating the Human Rights Act, it cannot be held liable for having failed to do so.

#### 2. *Foley's Conviction*

In addition to finding that the absence of an arrest record was not a BFOQ for maintenance work, *Ernst*, 863 F.Supp. at 656 also held that the employer was not liable for failing to consider a conviction that had resulted in a term of court supervision, citing Illinois' Uniform Conviction Information Act (20 ILCS 2635/1 to 2635/24). Under that statute certain conviction information must be available for public inspection, but "con-

tinuances to a date certain in furtherance of an order of supervision granted under Section 5–6–1 of the Unified Code of Corrections ... shall not be deemed 'conviction information'" (20 ILCS 2635/3(F)). Because it appears that Foley had been subject to just such an order at the time he was hired, it seems unlikely that Standard would then have had access to Foley's unlawful weapon conviction.

■ But let it be assumed for the moment (doubtful though it is) that Standard could have obtained the conviction information. Even so, any element of proximate cause that would link the hiring of *Foley* to Rountree's death is totally missing.

In that respect *Carter v. Skokie Valley Detective Agency, Ltd.*, 256 Ill.App.3d 77, 80, 195 Ill.Dec. 138, 140, 628 N.E.2d 602, 604 (1st Dist.1993) teaches:

> [A]lthough an employer may have negligently hired someone who caused harm to another, liability will only attach if the injuries were brought about by reason of the employment of the unfit employee.

In *Carter*, despite an employee's record of several previous convictions, the employer who hired him as an armed security guard was found as a matter of law not to have been a proximate cause of the murder that the employee committed off-duty[8] because "there must be a tangible connection between the employee's violent tendencies, the particular job he is hired to do, and the harm to the plaintiff" (*id.* at 83, 195 Ill.Dec. at 142, 628 N.E.2d at 606).

Plainly that standard is not met here in more than one respect. First, a jury would have to find that Foley's conviction of the unlawful use of a weapon constituted a violent tendency. Then the jury would have to find that tendency somehow hooked up with his being hired as a car hiker and—even

---

7. *Ernst* involved a plaintiff who was raped by the maintenance employee who had gained access to her apartment with his passkey (*id.* at 653–54). On several previous occasions the employee had been arrested, and once he had pleaded guilty to unlawful use of weapons, for which he completed one year of court supervision (*id.* at 654)—a record more severe than Babbington's and virtually identical to Foley's.

8. Although the *Carter* employee was off-duty, he wore his uniform and went to the location where he had been working, where he convinced one of the employees at that location to give him a ride, after which he raped and murdered her.

more tangentially—with the harm to Rountree, even though that harm was entirely disconnected from Foley's work as a car hiker. But perhaps the most damaging flaw in DeMyrick's position is in the total lack of foreseeability in any realistic sense.

That is true in a number of ways, but the most compelling is of course that it was not even the employee with the criminal record—Foley—who shot and killed Rountree. Instead it was *another* employee (one who worked at an entirely different Standard location)—Babbington—who did *not* have any record of convictions, who had not himself come to the hotel armed and who had later been given the handgun by still another young man who was not even a Standard employee. In terms of probabilities the situation is akin to the multiplication of a whole series of extremely small fractions, with the end product therefore approaching absolute zero. No reasonable jury could conclude otherwise. And so because Rountree's violent demise was assuredly not a foreseeable result of any deficiencies in Standard's hiring of Foley, it must be concluded as a matter of law that Standard did not proximately cause Rountree's death.

*Negligent Supervision Claim*

■ DeMyrick also argues that Standard was negligent in allowing Babbington and his friends to enter the hotel when not on duty and that Standard's failure to supervise in that regard proximately caused Rountree's death. DeMyrick makes much of the fact that Standard's employment handbook (S.Ex. J) contained this provision:

> Visitors. Visitors or friends and relatives of employees are not permitted to loiter in our facilities during your work hours. Don't allow strangers to "hang around." Don't visit other employees who are working. Employees should leave the premises after their shift has ended.

DeMyrick contends that the one Standard employee on duty that night, Lesly Beauzile, should have reported Babbington's violation of this rule when Babbington and his two friends showed up at the garage and then entered the hotel and that Beauzile's failure proximately caused the shooting (DeM. Mem.

11). That attempt, like the one just dispatched, is too tenuous to survive scrutiny.

First, it appears to involve an impermissible stretch of the facts to label Beauzile's failure to report the violation as a cause in fact of Rountree's death. Even if Beauzile had followed Standard's policy and reported the presence of Babbington to Beauzile's supervisor, it is not reasonable to infer that such reporting would have prevented Rountree's death. As the manager in charge of the Guest Quarters location testified, Beauzile would have had to page the night manager, who was not on duty for the overnight shift (Nicholson Dep. 26–17). And even if that manager had responded promptly to the call, it does not appear that he could have taken action to prevent the altercation during the 30 minutes that the three young men were in the hotel. Even DeMyrick's security expert does not suggest that Beauzile should have tried physically to stop the young men from entering the hotel. Instead he suggests that Beauzile could have called the hotel, whose personnel then could have searched for the boys (Talley Dep. 133). With Guest Quarters having only one security person on duty that night (Winn. Dep. 16), the hotel's timely intervention certainly seems to have been a remote possibility at best.

But what is ultimately fatal to DeMyrick's position is that even if cause in fact *were* found to be present, legal cause is plainly absent. Although the employment handbook provision may have been violated, the record evidence is that the provision was not designed to prevent harm to hotel guests, but was rather intended to prevent employees from being distracted by visiting friends and acquaintances when they were supposed to be working (Nicholson Dep. 25–26). Thus a violation of the handbook policy in no way warrants a conclusion that it was foreseeable to Standard that Babbington's appearance off-duty would lead to Rountree's death.

In fact, in light of the earlier determination that no basis existed for Standard's awareness of Babbington's arrest record (and remember once again that he had no convictions), Standard had no reason to assume that he would pose any greater threat to

Guest Quarters' guests then any member of the public. Illinois courts have refused to hold that an employer is an insurer of the safety of every person who happens to come into contact with its employees (*Carter,* 256 Ill.App.3d at 83, 195 Ill.Dec. at 142, 628 N.E.2d at 606). Following their lead (as *Erie v. Tompkins* requires), this Court too declines to hold Standard responsible for the violent actions of its off-duty employees. It holds as a matter of law that Standard did not proximately cause Rountree's death by allowing Babbington, Foley and Copeland to enter the hotel.

*Conclusion*

Because there are genuine material issues of fact as to whether Guest Quarters' inadequate security arrangements proximately caused Rountree's death, Guest Quarters' motion for summary judgment is denied. This action is set for a status hearing at 8:45 a.m. November 18, 1996 to discuss the future of the litigation.

As for DeMyrick's claim against Standard, no genuine issue of material fact exists as to any of the theories on which DeMyrick relies. Accordingly Standard's motion for summary judgment is granted, and DeMyrick's claim against Standard is dismissed with prejudice. And relatedly, because as a matter of law Standard was not negligent with respect to Rountree's death, Count I of Guest Quarters' Third Party Complaint for contribution by Standard is also dismissed.

If the just-described determinations as to Standard's lack of responsibility had eliminated all potential liability on its part, it would be appropriate to consider a Rule 54(b) determination to confer finality on those determinations (*National Metalcrafters v. McNeil,* 784 F.2d 817, 821 (7th Cir.1986)). But in this instance Guest Quarters has also advanced a Count II claim for indemnification by Standard. At the November 18 status hearing the parties should also be prepared to address the procedure for disposition of that remaining claim—a claim based on an indemnification provision that requires Standard to indemnify Guest Quar-

ters from any damage "arising out of" Standard's operation of the parking garage.