**Vivian DeMYRICK, etc., Plaintiff,**

v.

**GUEST QUARTERS SUITE HOTELS, et al., Defendants.**

No. 93 C 1520.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 27, 1997.

Philip Harnett Corboy, Jr. of Corboy & Demetrio, Chicago, IL, for Plaintiff.

Kathleen M. McCabe of Cassiday, Schade & Gloor, Chicago, IL, for Guest Quarters Suite Hotels.

Charles William Cross of Aronson, Smith & Cross, Chicago, IL, for Standard Parking Corp.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Guest Quarters Suite Hotels ("Guest Quarters"), the original defendant in this action stemming from the fatal shooting of Rhoderick Rountree ("Rountree"), brought a third-party claim seeking contribution (in its Count I) and indemnification (in its Count II) from Standard Parking Corporation ("Standard"). Plaintiff Vivian DeMyrick ("DeMyrick," Rountree's mother and the representative of his estate) later added Standard as a direct defendant in her Amended Complaint. This Court's November 5, 1996 opinion (the *"Opinion,"* 944 F.Supp. 661)[1] granted Standard's Fed.R.Civ.P. ("Rule") 56 motion for summary judgment against DeMyrick and also dismissed Count I of Guest Quarters' third-party claim against Standard. Because the *Opinion* denied Guest Quarters' simultaneous Rule 56 motion against DeMyrick, the question of Guest Quarters' negligence in connection with Rountree's death remains to be determined at trial.

Now Standard and Guest Quarters have filed cross-motions for summary judgment on Guest Quarters' Count II. Both parties have complied with this District Court's General Rule ("GR") 12(M) and 12(N),[2] and the cross-motions are fully briefed and ready for decision. For the reasons stated in this Opinion, Standard's motion is granted and Guest Quarters' motion is denied, so that its Count II is dismissed.

### Summary Judgment Principles

Familiar Rule 56 principles impose on a party seeking summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2551–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the non-moving party (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). Where as here cross-motions for summary judgment are involved, those principles require the Court to take a dual perspective—one that this Court has frequently described as Janus-like and that may on occasion cause the denial of both motions. But there is no need to engage in that exercise here: As will be seen, Standard's motion

---

1. Citation to the Opinion will take the form *"Opinion* at ——," reflecting the 944 F.Supp. page number.

2. Those provisions respectively require the submission of factual statements in support of and in opposition to Rule 56 motions. Unless otherwise noted, this opinion refers to those statements—"S. 12(M) ¶—" for Standard's GR 12(M) statements and "G.Q. 12(N) ¶—" or "G.Q. 12(N)(3)(b) ¶—" for Guest Quarters' additional GR 12(N) statements or its additional and separately numbered GR 12(N) statements, respectively—whenever the opposing party's corresponding response has either explicitly or implicitly admitted the cited assertion.

is successful, mooting any need to look at the record through a lens that favors its factual contentions. What follows, then, is a version of the facts culled from the parties' submissions, with any differences between them resolved in Guest Quarters' favor.

### Background [3]

In the early morning of May 25, 1992 Rountree, the road manager for Boyz II Men, was shot and killed in the Guest Quarters hotel located in downtown Chicago (S.12(M) ¶ 1). Christopher Babbington ("Babbington"), an off-duty Standard employee who worked at the garage located on Guest Quarters' premises, was the shooter (S.12(M) ¶¶ 2, 4, 5). Accompanying Babbington at the time of the shooting were two friends from high school days, Christopher Foley ("Foley") and Kenneth Copeland ("Copeland") (S.12(M) ¶¶ 3, 13). Foley was also an off-duty Standard employee, but he was stationed at a different Standard garage (S.12(M) ¶¶ 7, 8), one a few blocks away that was designated for overflow parking if the Guest Quarters lot was full (G.Q.12(N)(3)(b) ¶ 7 [4]). Copeland, who was not employed by Standard, gave Babbington the gun that was then used in the shooting (S.12(M) ¶¶ 11, 12).

▌ At issue for present purposes is whether in Standard's Garage Management and License Agreement ("Agreement," S. Ex. K) it had promised to indemnify Guest Quarters for any liability incurred as the result of Rountree's murder. Here is Agreement ¶ 10(e) (part of the Agreement's "Insurance; Indemnification" paragraph):

> Operator [Standard] will defend, with counsel reasonably acceptable to Owner [Guest Quarters], hold Owner harmless, and indemnify Owner from and against any loss, cost, damage or liability including reasonable attorneys fees (collectively "Claim") arising out of Operator's operation of the Parking Facility, unless such Claim arises from the sole negligence or willful misconduct of Owner or from a latent defect in the Parking Facility. This paragraph shall survive the expiration or any sooner termination of this Agreement.

Guest Quarters claims that it is entitled to indemnification because Rountree's death "arose out of" the operation of the garage. In that respect Guest Quarters Mem. 14 argues that Standard (1) failed to screen Babbington and Foley properly when hiring them as employees and (2) failed to train and supervise its employees to prevent Foley and Babbington from coming to the premises while off-duty. Standard R. Mem. 9 counters that its hiring of Babbington and Foley and its training and supervision of its employees were not sufficiently causally linked to warrant a finding that Rountree's death "arose out of" Standard's operation of the garage. This opinion turns to Standard's Rule 56 motion in those terms.

### Agreement ¶ 10(e) [5]

Guest Quarters would have the Contract's indemnification provision interpreted in the broadest possible sense, under which any arguable connection—however remote—between Standard's actions and Rountree's death would be enough to trigger the indemnity clause irrespective of any *proximate* causal relationship or of any claimed fault on Standard's own part. But in so arguing, Guest Quarters Mem. 13 mistakenly relies on a series of cases that define the duty to

---

3. For a more detailed version of the facts, see *Opinion* at 663–65.

4. Standard's response to that GR 12(N)(3)(b) statement—a response repeated throughout Standard's GR 12(M) reply—says that Standard agrees factually with Guest Quarters' statement but objects that the information is irrelevant. Such a legal objection does not effectively controvert the factual assertion, so that Standard's response is deemed an admission (see, e.g., *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994)).

5. Because this is a diversity action involving no federal-question claims, *Erie v. Tompkins* principles call for state substantive law to provide the rules of decision. And because of the exclusively Illinois nexus of the underlying occurrence as well as the Agreement and the premises themselves—which doubtless explains why neither party has addressed the choice-of-law issue—this opinion looks to Illinois contract law (as to the litigants' failure to speak about choice of law, see, e.g., *Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency*, 39 F.3d 138, 141 n. 2 (7th Cir.1994)).

*defend* rather than the duty to *indemnify.*[6] As taught by a host of Illinois cases, including the Guest–Quarters–cited decision in *Aetna Cas. & Sur. Co. v. Prestige Cas. Co.*, 195 Ill.App.3d 660, 664, 142 Ill.Dec. 689, 691, 553 N.E.2d 39, 41 (1990) (citations omitted):

> It is settled law in Illinois that an insurer has two duties to an insured that may trigger the insurer's policy coverage: the duty to defend and the duty to indemnify. These are separate and distinct duties and the duty to defend is broader than the duty to indemnify.

■ By contrast, the actually relevant case law of indemnification reveals that Illinois permits indemnification against the indemnitee's own negligence only when there is "clear and explicit language of the contract [citations], or such intention is expressed in unequivocal terms" (*Tatar v. Maxon Constr. Co.*, 54 Ill.2d 64, 67, 294 N.E.2d 272, 273 (1973), quoting *Westinghouse Elec. Elevator Co. v. LaSalle Monroe Bldg. Corp.*, 395 Ill. 429, 432, 70 N.E.2d 604, 606 (1946) (alteration in original)). *Tatar, id.*, 294 N.E.2d at 273–74 also states the standard to be applied for that purpose:

> [T]he contractual provisions involved [in the numerous cases construing contracts of indemnity] are so varied that each must stand on its own language and little is to be gained by an attempt to analyze, distinguish or reconcile the decisions. The only guidance afforded is found in the accepted rule of interpretation which requires that the agreement be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions.

■ In terms of the Agreement's language (as *Tatar* instructs), the operative provision is Standard's undertaking to indemnify Guest Quarters for "any loss ... arising out of [Standard's] operation of the Parking Facility, unless such claim arises from the sole negligence ... of [Guest Quarters]." Although the phrase "arising out of" does not require "[p]roximate cause in the strict legal sense," at least "some causal relation" is essential (*Woodside v. Gerken Food Co.*, 130 Ill.App.3d 501, 507, 85 Ill.Dec. 811, 815, 474 N.E.2d 771, 775 (1985)). Even if an indemnitor creates a condition that "set the stage" for the injury, if the injury is unrelated to the indemnitor's contract performance covered by the indemnity agreement, the indemnitor will not be required to indemnify (*Trans World Airlines, Inc. v. Standard Paving Co.*, 45 Ill.App.3d 276, 281, 3 Ill.Dec. 905, 908, 359 N.E.2d 764, 767 (1977) ("*TWA*"), citing *Smart v. International Harvester Co.*, 33 Ill.App.3d 241, 245, 337 N.E.2d 68, 71 (1975)).[7]

*Opinion* at 668–71 has already determined that Rountree's death was not proximately caused by Standard's actions or omissions. What must now be decided is whether some lesser degree of causation was present that is enough to trigger indemnification.

Guest Quarters seems to think that a critical (perhaps the main) issue for resolution is instead whether Standard was guilty of a breach of contract—its asserted violation of portions of the Agreement other than its indemnification commitment. At least that is how Guest Quarters frames its entire substantive discussion of Standard's claimed delinquencies (G.Q.Mem.3–9). That of course

---

**6.** For example, four of the five cases that Guest Quarters cites for the proposition that a mere "but for" relationship is the relevant inquiry for this Court addressed whether insurance companies had a duty to defend claims based on their policy provisions. In the one case that did involve the duty to indemnify, *Western Cas. & Sur. Co. v. Branon*, 463 F.Supp. 1208, 1210–12 (E.D.Ill.1979), the court found that no coverage existed because "a causal connection must exist" and because the accident there "did not arise out of the use of the vehicle"—the same thing that is true here.

**7.** *TWA* dealt with a contract provision similar to that in the Agreement. There a paving company

hired to install asphalt on an airport runway agreed to indemnify the airline for any claims "arising out of or in connection with the performance" of the contract, but excluded "any and all claims by reason of any negligent act or omission solely of [the airline]" (*id.* at 278, 3 Ill.Dec. at 906, 359 N.E.2d at 765). *TWA* held that a collision between an airplane and one of the paving company's backhoes was caused by TWA's sole negligence—hence the indemnity provision did not cover the accident despite the fact it would not have occurred without (that is, "but for") the backhoe's presence next to the runway (*id.* at 281, 3 Ill.Dec. at 908, 359 N.E.2d at 767).

is dead wrong, and that misconception may have discolored Guest Quarters' total approach to the current motions. This opinion however will focus on the correct target, viewing Standard's conduct as it impacts on Agreement ¶ 10(e).

*Standard's Hiring of Babbington and Foley*

■ Guest Quarters Mem. 4–7 first contends that Standard's hiring procedure was inadequate, causing assertedly unsuitable people (Babbington and Foley) to be employed and thus causing Rountree's death.[8] As an initial matter, the *Opinion* has already made clear that Illinois law prohibits employers from discriminating in hiring on the basis of an employee's arrest record, as opposed to a conviction record (*id.*), and Agreement ¶ 7 specifically required that Standard "comply with all applicable laws and regulations pertaining to the employment" of its employees. Thus Standard could not have appropriately considered any arrest records of Babbington and Foley when hiring them.

■ In addition, Illinois law does not treat a conviction with a term of court supervision as a "conviction" for the purposes of access to public records (*Opinion* at 669). Even if Standard might have been able to discover Foley's *pending* term of court supervision at the time of his hiring,[9] *Opinion* at 669–70 found any arguable chain of causation between Foley's hiring and Rountree's death to be so attenuated as to approach (if not indeed to reach) the vanishing point. After all, Foley neither worked at the Guest Quarters location nor carried the weapon used in the shooting, nor did he himself shoot Rountree. Thus his only involvement—his mere presence with Babbington and Copeland in the hotel that night—constituted neither proximate nor "but for" causation. In sum, Roun-

tree's death simply cannot be seen as "arising out of" Foley's hiring.

All that remains, then, of Guest Quarters' improper hiring charge are two minor omissions by Standard in hiring Babbington (both noted in G.Q. 12(N)(b)(3) ¶ 3):

1. Standard did not record whether one of its managers checked Babbington's references, though it had a policy of noting reference checks on employment applications.

2. Babbington was hired despite his having left one portion of his employment application (S.Ex. D)—that referring to his educational background—blank.

For purposes of Standard's motion this Court must draw the unfavorable inference from Standard's failure to record the above information that it had never obtained the information at all.

Even so, those omissions plainly do not (either singly or together) create a causal connection between Babbington's hiring and Rountree's death. There is not a word in the record that even hints that if Standard *had* inquired into Babbington's references or his educational background, that inquiry would have generated any information such that Standard would not or should not have hired him (G.Q.Mem.4–7). Nor is Guest Quarters assisted at all by the Rule 56 concept of drawing reasonable inferences, for under that concept inferences must be based on evidence—and *here there is no evidence*. In the total absence of anything to suggest that taking those steps of added inquiry would have alerted Standard to some violent propensity on Babbington's part, as a matter of law Standard's omission cannot be found to have caused Rountree's death in terms of

8. Throughout its submission (its Mem. 4–9) Guest Quarters attempts to make much of the Agreement's requirement that Standard hire "suitable employees" and operate the garage according to the "highest professional practices" for Chicago parking facilities. But whether Standard in fact met that standard in hiring and training its employees is not the relevant question in the present causation inquiry—for even a violation of Standard's contractual duty would not trigger the indemnification clause unless Rountree's death "arose out of" that violation of

the Agreement. Because this opinion later concludes that neither Standard's hiring nor its supervision of its employees was sufficiently linked to Rountree's death, it is entirely moot whether Standard's actions were in keeping with the "highest professional practices."

9. When he was hired Foley was still involved in a period of court supervision, which was later completed and resulted in his discharge on November 25, 1992 (S.Ex. G).

either proximate cause or a lesser "but for" cause test.

### Standard's Training and Supervision of Its Employees

■ Guest Quarters also asserts that Standard's failure to enforce its "no visitation" policy was somehow linked to Rountree's death in causal terms. In support of that contention Guest Quarters Mem. 7–9 points to these matters (which must be assumed as true on the current motion):

1. Foley said that he did not receive or know about Standard's Employee Conduct and Responsibilities Manual (the "Manual," S. Ex. J), despite Standard's policy of distributing the Manual to all of its employees at Guest Quarters' location (G.Q.12(N) ¶ 7; G.Q. 12(N)(3)(b) ¶ 5).

2. Included in the Manual is a "Visitors" provision that states in relevant part (S.Ex. J):

> Don't visit other employees who are working. Employees should leave the premises after their shift has ended.

3. Although Lesly Beauzile ("Beauzile"), the lone Standard employee on duty at the time of Rountree's death, knew that Babbington—not then on duty—had come in with two friends and entered the hotel, Beauzile did not immediately page the off-site supervisor and report Babbington's actions (G.Q.12(N) ¶ 8).

Again those assumed facts do not suffice to cause Rountree's death to "arise out of" Standard's "operation of the parking facility" in any normal sense of those terms.

To be sure, Agreement ¶ 7 incorporated the Manual's provisions by reference. But by what token can that fact (or the Manual itself) be said to bear the necessary relationship to Rountree's death to trigger the contractual duty to indemnify Guest Quarters? It takes only a few moments' analysis to see that question must be answered "in no way."

As for the Manual's directive itself, *Opinion* at 670–71 has already made the obvious point that from the record (understandably, given the language of the Manual's provision) the non-visiting policy was designed to prevent on-duty employees from being distracted by friends and off-duty employees rather than attending to their work, and not to prevent harm to hotel guests.[10] Indeed, the three young men were not literally violating the Manual's provisions—they were neither visiting other employees nor staying over after Babbington's work shift had ended. Guest Quarters would try to convert that provision into an automatic full insurance clause under which Standard would have to make good on the consequences of its off-duty employees' frolics[11]—a notion that simply will not fly. Although the parties could conceivably have contracted for such a result, they clearly did not: By its terms the Agreement is limited to claims arising out of the "operation of the parking facility," which belies such a broad scope of indemnity[12] and surely does not fit the facts here.

Finally, *Opinion* at 670 has scotched the only other potential argument in this area, that pointing to Beauzile's failure to have reported Babbington's presence. Leave aside for the moment the fact that the Manual's provision was not literally breached by Babbington's being at the hotel at the time and under the circumstances at issue. But

---

**10.** Guest Quarters Mem. 8 suggests that the policy had other purposes, citing Dan Nicholson's testimony that the policy was also designed to help the hotel distinguish between off-duty and on-duty Standard employees. That contention does not change the inapplicability of the provision to the situation here: When Babbington, Foley and Copeland entered the hotel in the wee hours of the morning they were out of uniform (Copeland Dep. 24–25) and patently were *not* on-duty employees.

**11.** That colorful term, with its roots deep in the common law (see *Pyne v. Witmer*, 129 Ill.2d 351, 360, 135 Ill.Dec. 557, 562, 543 N.E.2d 1304,

1309 (1989) and authorities cited there) has pretty much dropped out of current usage—a pity.

**12.** That common sense reading is buttressed (though it needs no external support) by a look at the probable intentions of the parties in allocating the risk involved here, as suggested by *Concast, Inc. v. AMCA Sys., Inc.*, 959 F.2d 631, 632 (7th Cir.1992). Guest Quarters is plainly in a better position to provide security for the safety of its guests than Standard is in a position to control its employees while not on duty. No justification exists for reading the Agreement as shifting that risk from Guest Quarters to Standard.

even if Beauzile *had* sought to reach his supervisor, given Guest Quarters' one-person security staff on duty that night any prospect of that effort avoiding the altercation and fatal shooting that ensued was remote to nonexistent. No such hypothetical causal link (which might well fail to meet even a "but for" test) can reasonably be said to warrant a finding that Rountree's death "arose out of" Beauzile's failure to call his supervisor. And if looked at in the asserted failure-to-train context on which Guest Quarters relies, any causality argument borders on the absurd (or crosses that border).

## Conclusion

No genuine issue of material fact exists as to whether Rountree's death "arose out of" (1) Standard's hiring of Babbington and Foley or (2) Standard's claimed nonenforcement of its "Visitors" policy or failure to train its people. Standard's actions or inactions simply did not rise to a sufficient level of causation to trigger the indemnification clause designed by the parties.[13] Standard is therefore entitled to a judgment as a matter of law, in consequence of which Standard's motion for summary judgment is granted and Guest Quarters' motion is denied. Count II of Guest Quarters' Third Party Complaint for indemnification by Standard is dismissed with prejudice. Because this opinion totally terminates Standard's involvement in the litigation, which remains pending as between DeMyrick and Guest Quarters, the parties may wish to consider the possible applicability of a Rule 54(b) determination (see *National Metalcrafters v. McNeil,* 784 F.2d 817, 821 (7th Cir.1986)), a subject that they have not addressed.

---

**13.** In light of this ruling, it becomes unnecessary to resolve Standard's further argument that indemnification is also barred under the stated exception for any claim that "arises from the sole negligence or willful misconduct" of Guest Quarters. But it should be remembered that *Opinion* at 668–71 granted summary judgment in Standard's favor against DeMyrick's contentions that Standard was negligent—and the facts on the present cross-motions are no different than they were then.